LELAND NOEL et al. *vs.* JONES HARVEY et al.

Where an executor or administrator employs counsel at a large contingent fee, whose services are shown to be necessary for the protection of the estate, it will be allowed by the probate court.

Where a testator declares by his will, that " I do further confer on my executors full power to sell any of my estate, real or personal, for the payment of my debts, should they think it necessary:" *Held*, that the power conferred by the will on the executors, is a joint power to be exercised by all of the executors who are qualified, and one executor could not be a purchaser from himself and the others. Such sale is void.

ON appeal from the probate court of Holmes county; Hon. Alva Wilson, probate judge of Holmes county.

Plaintiffs in error filed their bill of review in the probate

Noel et al. *v.* Harvey et al.

court of Holmes county against Harvey S. Sample and Benj. Griffin, executors of D. M. Dulany, deceased, and against Mary H. Sample, administrator of Isaac Sample, deceased, who was one of the executors of said D. M. Dulany. The bill charges that said executors exhibited their account for final settlement, and that the same was passed, and said executors discharged ; that plaintiffs in error, Margaret Noel, David and Benjamin Sanders, are grandchildren of said Daniel M. Dulany, and children of Sarah E. Harvey, by a former marriage; that said Sarah E. has died, leaving four other children by said Jones Harvey; that, being interested as distributees of said decedent, they desire to have said final settlement reviewed. They charge that said executors wrongfully and without authority credited themselves with six thousand dollars paid to Wm. R. Miles, Esq., (see contract with Miles, marked Exhibit B, setting forth the contract with the executors) ; they state that Miles contracted with Dulany in his lifetime to perform the services mentioned in exhibit B, for $500; that the executors had no right to change the contract; that said credit ought to be reduced at least $4,500.

It is further charged that said Jones Harvey and Isaac Sample, two of the executors, pretended it was necessary to sell a portion of the negroes specified in the inventory, for the purpose of paying debts due from the estate; that Harvey bought, in 1848, three of them at $2,080, and Sample three at $2,100; that as executors, in their settlement with the probate court, they charge themselves with the price of said negroes, as having been sold for cash; that it was the wish of said Dulany that his property should not be sold unless it was necessary for the payment of his debts ; that the debts could have been paid by proper management of his estate.

A copy of said Dulany's will is filed with the bill as exhibit A. They pray that said account be reviewed and restated.

The answer admits the execution of the will ; that their final account has been allowed; that by said Daniel M. Dulany's will his property was bequeathed to his daughters, Sarah E. Harvey and Mary H. Sample aforesaid, for their natural lives, with remainder to their respective children; that said Sarah E.

left seven children, four of them by said Jones Harvey, as charged in the bill; denies that said executors wrongfully and without authority credited themselves in their final account with $6,000 paid to W. R. Miles, but say that they were empowered to contract with him as they did to defend and prosecute certain suits against said estate, and pay him therefor; admit that voucher No. 1, of the final account (Exhibit B.) sets forth their contract with Miles for prosecuting a chancery suit against John S. Gooch et al., in the name of D. M. Dulany, and raised by them, for which $5,000 of the sum paid Miles was agreed to be given, provided he gained said suit; that Dulany had agreed to give Miles $500 as adjunct counsel to aid Prior Lea in the prosecution of said suit; and after the death of Dulany, Lea (Prior) abandoned the suit; the amount in controversy was $48,000, or far more than the estate was worth; if defeated in the suit, ruin to the estate would have been the consequence. They believed it would be to the interest of the estate to give Miles a large contingent fee; that it would, and did, induce him to make greater exertions on behalf of the estate than he otherwise would have done; that they first offered him three thousand dollars, which he refused to take, then four thousand dollars, which he likewise declined, and would take nothing less than five thousand dollars as a contingent fee; that Miles, being a lawyer of reputation and character, they did not then, nor now, believe that he would charge them an unreasonable fee; they deny that the services for which they agreed to give him the five thousand dollars were the same he was to render for Dulany for five hundred dollars; they state that he was retained by Dulany as an adjunct counsel, but by them to prosecute said suit alone; by them he was engaged to advise a compromise, if advisable, or prosecute the suit to an end, if thought best; deny that there was no additional consideration for said fee, but say there was an additional consideration, as appears on the face of said voucher, No. 1, and from what is above stated; say that they were authorized to make said contract; state that said Jones Harvey and Isaac Sample, at the time it was made, were the husbands of said Sarah E. Harvey and Mary H. Sample, who were the legatees of said D. M. Dulany,

Noel et al. *v.* Harvey et al.

and that it was consequently their interest to procure the services of said Miles as cheap as possible; part of said six thousand dollars is for other fees, and not complained of.

Admit that said executors, on 1st January, 1850, sold the negroes in the bill mentioned to Harvey and Sample, as will appear by the bills of sale executed to them by all the executors, marked, Exhibits Nos. 2 and 3; deny that said Harvey and Sample simply selected and took said negroes, but say they purchased them from all the executors at a fair price, and at a valuation fixed by three competent and disinterested gentlemen; deny that said sale was made to defraud the estate; say it was necessary to pay debts of said decedent; that it was largely in debt, and the executors, in the language of the will, thought "it necessary to sell (some) of the real and personal estate" to pay debts of said decedent, and by the will that they were authorized to do so (see the will, Exhibit, 4), and accordingly sold said negroes and some land; that the Commercial Bank of Manchester had a deed of trust against said Dulany, and about $5,400 was due them, to meet which, together with other debts, it was necessary to sell property; that at the time of said sale, and for years previous, the cotton crops had nearly been destroyed by worms, and most planters were losing money, and there was no prospect of paying the debts of the estate by farming, and a sale was absolutely necessary to pay the debts; deny that the sale of the land was made for the purpose of defrauding the estate. They filed all the notes, &c., in their hands, with their answer, and insist that their acts as executors were proper and in good faith; that said account was properly passed, and ought not to be opened or restated, or the decree allowing it set aside.

The answer was made a demurrer to the bill, and the same benefit by way of demurrer prayed as if the defendants had specially demurred.

Complainants filed an amended petition, setting up several minor errors in the account, which are denied by the answer thereto. The principal matters argued in the lower court were the sale of the negroes and the allowance of the fee to General Miles; and it is the wish of Mr. Brooke, plaintiffs' counsel, and

myself, that those two points should be decided by this court. If there is any mistake as to interest, and in the addition, &c., referred to in the amended petition, the defendants have agreed to correct it.

Miles was examined by the defendants, and was released in open court, as will appear by the bill of exceptions. He testified that Dulany employed him in the case of *Dulany* v. *Gooch et al.*, then pending in the chancery court at Jackson. The bill had been filed by Prior Lea, who was the leading counsel; witness was employed as "adjunct" counsel, and was to have no connection with the case except to aid in its argument, after it had been prepared for trial by complainants and Mr. Lea; D. was to give him five hundred dollars; in spring of 1848 D. died, the suit still pending; by his will he appointed defendants his executors; Prior Lea left this State and removed to Texas. After these events occurred, the executors applied to witness to take charge of the suit as counsel in chief, prepare it for final hearing, and argue it alone. It had then been on the docket about eight years, and was a large cause, involving about $48,000; contingent fees at various rates; from two thousand to four thousand dollars were offered him, which were refused; after several interviews and much conversation, five thousand dollars were agreed on. His agreement with the executors was a new contract, imposing on him new obligations and additional labor, for which he was to get additional compensation, or none, as the suit might result. He entered upon the discharge of the new duties, hunted up evidence necessary to place the cause at final hearing at his own labor and expense, as he had agreed to do; the suit was gained, and the fee paid. The executors knew nothing of the merits of the case, nor the witness where evidence could be procured; on these points Dulany had not conversed with him, and Lea having left the State, witness was left " to grope his way in the dark, and hunt the evidence as best he could."

On cross-examination he said Prior Lea was a good lawyer, and had a fair practice during his residence at Jackson; his brother, Luke Lea, was a lawyer of good standing; he (L. Lea) came to Jackson after the commencement of the suit;

L. Lea's name is not on the papers as solicitor, and does not know that he ever had any connection with it; he took no part in it after witness was retained by the executors, nor was witness aided by P. Lea by letter or otherwise.

In the summer of 1848, after he had been retained by the executors, witness was travelling in the eastern part of the State, and met with a man from whom he derived much valuable information in regard to the suit, whom he had never before seen or heard of, from which information he was enabled to obtain from the land or Indian office at Washington City evidence on which he gained the main suit; a branch of it was gained in the Holmes circuit court, by the joint efforts of himself and Mr. Brooke, who had been employed by some indorsers on one or more of the notes involved in the chancery suit." General Miles's testimony is set forth in a bill of exceptions fully in the cause, to which the attention of the court is especially called. There were other witnesses examined, but their evidence is not in the bill of exceptions.

The demurrer in the answer to so much of the bill as seeks to set aside the sale of the six negroes to Jones Harvey and J. Sample was sustained. The balance of the case then came up for final hearing, and the bill was dismissed; and the case was brought by the complainants to this court by appeal.

No counsel for appellants.

J. M. Dyer, for appellee, filed an elaborate brief, reviewing the law and the facts of the case at much length, and cited the following authorities: Lomax on Executors, 367; 1 Sug. on Powers, 140; Muncaster v. Bland, 24 Miss. 62; 2 Johns. Ch. 252; 26 Miss. 117; Miles v. Erwin, 1 McCord, Ch. 524; 9 Johns. 253; Lecatt v. Sallee, 3 Port. 115.

Mr. Justice FISHER delivered the opinion of the court.

This is an appeal from a decree of the probate court of Holmes county, made upon a bill of review filed in said court, for the purpose of reopening the final settlement of the execu-

tors of the last will and testament of Daniel M. Dulany, deceased.

It is, in the first place, insisted that the executors improperly credited themselves with the sum of five thousand dollars paid to William R. Miles for professional services rendered in a suit commenced in the superior court of chancery, by Dulany in his lifetime, against John S. Gooch and others. It appears from the testimony that Prior Lea was originally retained as Dulany's counsel in the cause; that he removed from the State before the cause was prepared for trial; that it was pending in court at Dulany's death; that the executors, being wholly unacquainted with the facts of the case, and not knowing where the testimony could be obtained to sustain the bill, employed Mr. Miles at a contingent fee of five thousand dollars, he undertaking to take the testimony, to incur all the expenses necessary to take the same, and his fee to depend upon the result of the suit. It further appears that the amount in controversy was about $48,000; that the services were performed by Mr. Miles, and the case gained. It further appears that the contract was made in good faith.

Under this state of facts, we are of opinion that the court below committed no error in allowing the credit. The only question in such case to be considered is, whether the services were necessary for the protection and interest of the estate, and whether the contract, under all the circumstances, was such as a prudent and cautious man would have entered into for himself. The proof brings the case within this rule.

It is next insisted that the executors sold certain of the slaves of the testator without legal authority, and that they ought to account for the slaves, or their present value, together with reasonable hire. The clause in the will relied on to sustain the sale, is in these words, namely : " I do further confer on my executors full power to sell any of my estate, real or personal, for the payment of my debts, should they think it necessary."

It appears from the evidence, that two of the executors purchased the slaves in question, and joined with the other executors in the bills of sale to the purchasers, or in other words, to themselves. The power conferred by the will on the executors

was a joint power, to be exercised by all of them who were qualified under the will. One executor, therefore, could not be a purchaser from himself and the others. His duty as a vendor required him to act in good faith, and to the best advantage for the estate. His interest as a purchaser too far conflicted with his duty in this respect to make it probable that his judgment as a vendor was properly and impartially exercised for the benefit of the estate in his hands to be managed. The sale is, therefore, void; and, being void, the slaves must be treated as so much of the estate not legally accounted for by the executors.

The purchase-money paid for the slaves will be treated as so much money advanced by the executors to the estate in paying debts against it. The executors will be chargeable with the present value of the slaves, or the value of them at the date of the final settlement, at the option of the parties interested under the will, together with reasonable hire; and the executors, if it shall appear that the purchase-money has been applied in the payment of debts, will be entitled to a credit for the same, together with interest from the time it was applied by them to the payment of the debts of the estate.

These being the only matters presented by the decree of the court below, and the record, for our consideration, the decree will be reversed, and the cause remanded.